**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| HIGHMARK INC., HIGHMARK BCBSD INC.; HIGHMARK WEST VIRGINIA INC.; and HEALTHNOW NEW YORK INC. (d/b/a BLUECROSS BLUESHIELD OF WESTERN NEW YORK and BLUESHIELD OF NORTHEASTERN NEW YORK), <br><br> *Plaintiffs*, <br><br> v. <br><br> CVS PHARMACY, INC., <br><br> *Defendant*. | Civil Action No. <br><br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

PARTIES ............................................................................................................................ 5

     A.    Plaintiffs ............................................................................................... 5

     B.    Defendant ............................................................................................. 6

JURISDICTION AND VENUE ......................................................................................... 6

FACTUAL ALLEGATIONS ............................................................................................. 7

I.     CVS's Business ................................................................................................. 7

II.    CVS Is Required To Submit True And Accurate Usual & Customary
     Prices To Plaintiffs .......................................................................................... 8

     A.    CVS Must Submit The True And Accurate U&C Price
          During The Adjudication Process. ...................................................... 8

     B.    Plaintiffs Pay CVS, Through PBMs, The "Lesser Of"
          A Negotiated Price Or The U&C Price ............................................. 9

     C.    U&C Is A Critical Pricing Measure That CVS Regularly
          Monitors And Also Manipulates ...................................................... 11

III.   CVS Did Not Submit The Cash Discount Program Prices As The U&C Price. ............. 11

     A.    CVS's Competitors Adopted Discount Programs,
          Which Threatened CVS's Margins. ................................................. 11

     B.    CVS Implemented The HSP Program Not Only To Compete
          With Other Discount Programs, But More Importantly,
          As A Pretext To Avoid Reporting HSP Prices As U&C Prices. ......................... 13

     C.    CVS Continued Its Unlawful Scheme Using ScriptSave ...................................... 17

     D.    CVS Replaced The HSP Program With The VPSC Program. .............................. 20

     E.    CVS Unlawfully Reported False U&C Charges, Thereby
          Overcharging Plaintiffs By Massive Amounts. .................................................. 20

IV.   CVS's Fraudulent Concealment Tolled The Statute Of Limitations. ............................... 21

COUNT I (Fraud) .......................................................................................................... 23

COUNT II (Fraudulent Concealment) ............................................................................ 25

COUNT III (Negligent Misrepresentation) .................................................................................. 27

COUNT IV (Unjust Enrichment).................................................................................................. 28

COUNT V (Civil Liability For Larceny by False Pretenses *Pursuant To*
R.I. Gen. Laws § 9-1-2; § 11-41-4) ........................................................................................... 29

ALTERNATIVE CLAIMS............................................................................................................ 30

COUNT VI (Violation of the Pennsylvania Unfair Trade Practices and
Consumer Protection Law (The "UTPCPL") 73 P.S. §§ 201-1 – 201-9.3)
(Brought by Highmark Inc.) ....................................................................................................... 30

COUNT VII (Violation of the Pennsylvania Insurance Fraud Act
73 Pa.C.S.A. § 4117, et seq.) (Brought By Highmark Inc.) ........................................................ 31

COUNT VIII (Violation of the Delaware Consumer Fraud Act (The "DCFA")
6 Del. C. § 2511 et seq.) (Brought by Highmark BCBSD Inc.) ................................................... 32

COUNT IX (Violation of N.Y. Gen. Bus. Law § 349, et seq.) (Brought by HealthNow) ........... 33

PRAYER FOR RELIEF ............................................................................................................... 35

JURY DEMAND .......................................................................................................................... 36

Plaintiffs Highmark Inc., Highmark BCBSD Inc., Highmark West Virginia Inc., and HealthNow New York Inc. (d/b/a BlueCross BlueShield of Western New York and BlueShield of Northeastern New York) ("Plaintiffs"), bring this Complaint against Defendant CVS Pharmacy, Inc. ("CVS"), and allege as follows:

## NATURE OF THE ACTION

1.      For more than a decade, CVS—the largest retail drugstore chain in the United States—has intentionally engaged in a fraudulent scheme to overcharge Plaintiffs for prescription drugs by submitting claims for payment at artificially inflated prices.

2.      Plaintiffs offer health care plans for comprehensive health care services and coverage, including prescription drug coverage, to their members in Pennsylvania and other states.

3.      The scheme was, at its core, quite simple.  CVS offered hundreds of generic drugs at low, discounted prices through cash discount programs:  originally, its Health Savings Pass ("HSP") Program, and then a later successor to the HSP Program, the Value Prescription Savings Card ("VPSC") Program (together, the "Cash Discount Programs").

4.      CVS created and maintained the Cash Discount Programs for two reasons: *first*, to compete for cash customers who might otherwise be attracted to discounts offered by CVS's competitors, and *second*—and more importantly—to obfuscate its true prices from third party payors, including Plaintiffs.  CVS intentionally told third party payors, including Plaintiffs, that the prices charged to cash customers for these generic drugs were higher—often much higher. Third-party payors then reimbursed CVS based on those higher, inflated prices—instead of the actual, lower, prices CVS offered to the general public, including through its Cash Discount Programs.

5.      CVS was *required* by governing contracts, and industry standards, to submit the same low price it offered to the general public who paid "cash"—*i.e.*, who paid out-of-pocket not

1

using insurance—called the Usual & Customary ("U&C") Price.  By intentionally submitting falsely inflated U&C prices, CVS knew that it was being overpaid for these generic drug transactions.  In fact, as internal documents show, that was CVS's plan all along.  CVS has now pocketed *billions* of dollars in ill-gotten gains through this unlawful scheme—including millions from Plaintiffs.

6.     This is fraud.  And CVS was able to perpetrate and conceal this fraud for years.

7.     When a customer purchases drugs at CVS (or at other pharmacies) using insurance, the pharmacist or pharmacy technician enters the prescription information and information from the customer's insurance card into CVS's computerized claims processing system.  Once this information is entered, CVS submits the claim for dispensing and adjudication.

8.     Adjudication is the automated process by which CVS submits prescription claims electronically in real time to third party payors or, as with Plaintiffs, to middlemen known as Pharmacy Benefit Managers ("PBMs"), who contract separately with both CVS and Plaintiffs to provide administrative and claims processing services.  When submitting electronic claims for payment, CVS is required by contract and industry standards to truthfully and accurately submit its U&C price, which is the price offered to a member of the general public paying for a prescription drug without insurance.

9.     The PBMs electronically verify the claim and confirm patients are eligible for insurance coverage or another prescription drug benefit.  The PBM then determines the amount owed by Plaintiffs and the out-of-pocket amount owed by the insured customer.

10.    Payment amounts are subject to specific limitations widely used throughout the industry.  When Plaintiffs' members fill prescriptions for those drugs using their insurance,

Plaintiffs reimburse CVS (through the PBMs) at specific prices negotiated by their PBMs with CVS—subject to a very relevant and very important exception.

11.     Plaintiffs' reimbursement arrangements with PBMs provide that, if the U&C price is *lower than* the negotiated price, Plaintiffs are only required to pay CVS the U&C price.  This makes perfect sense.  This commonplace provision ensures that Plaintiffs (and their insureds) do not pay *more* for a given generic drug than a customer who pays "cash"—*i.e.*, pays out-of-pocket, without using any insurance.  Indeed, contracts, network pharmacy manuals, Medicare and Medicaid requirements, payor sheets, and industry standards, all recognize that the U&C price operates as a ceiling for reimbursement.

12.     CVS knew that a discounted price offered to a cash customer constituted its true U&C price; that this discounted cash price must be reported to third party payors as the U&C price; and that reimbursement by those third party payors at the new U&C price would have a deeply negative effect on CVS's revenue.

13.     Large big-box stores competing for CVS's generic drug customers, like Walmart, *did* report its discounted prices as the U&C price and so too did Target (at least until CVS acquired Target's pharmacies in 2015 and caused it to stop doing so).  For those large big-box stores, pharmacy revenues form a relatively small part of their overall business.  But for CVS, customers filling generic prescriptions are an essential source of revenue.  Over 75% of CVS's revenue from its retail stores derives from pharmacy sales, and over 88% of those transactions are for generic drugs.

14.     Although it sought to compete with these big-box discount drug programs, CVS did not want to report discounted prices for generic drugs as U&C prices.  So, CVS tried to have its cake and eat it too.  It tried to find a way to both broadly offer discounts to retain critical

pharmacy customers, including cash paying customers, and also avoid the unprofitable result of reporting the discounted prices as the U&C price.

15.     CVS deliberated internally about how to accomplish this goal and devised a "membership program"—the HSP program.  But this program was a ruse from the start.  *Anyone* could become a member—even pets—for a negligible fee of $10 and later $15.  Moreover, internally CVS described the program as a "cash program," "cash card," or "cash script," and CVS marketed the program to the public as a "discount."  Further, CVS's transaction data categorizes HSP transactions as a "cash discount" program price.  In other words, the HSP price was the "cash" price offered to the general public and should have therefore been reported as the U&C price.  But CVS intentionally decided not to do so.

16.     CVS intentionally concealed this scheme for years.  CVS did little to promote or advertise its HSP prices, and CVS certainly did not inform Plaintiffs that the U&C price transmitted during the adjudication process was not the true U&C price, which in many instances was the lower price offered in the HSP program.  Moreover, CVS has refused to disclose its cash pricing information to allow third party payors, including Plaintiffs, to discover CVS's *true* U&C prices.  In fact, CVS frequently made the HSP prices available to non-HSP member cash customers—showing that the supposed "membership" aspects of the program were pretextual.

17.     Had CVS been open and notorious about its fraudulent pricing scheme, it never would have succeeded—Plaintiffs would have insisted that CVS submit the correct U&C price.  Indeed, while carrying out this scheme, CVS internally feared that third party payors would learn of the deception and demand correction.

18.     Fearing that it would be caught in its misconduct, CVS supposedly terminated the HSP Program in 2016.  But in reality, CVS simply replaced that program with another cash

discount offering that was substantially similar (but had no membership fee): the VPSC Program. CVS moved over its existing HSP Program members to the VPSC Program by default unless a member opted out. And CVS continued on with its deceptive and manipulative practice: offering the VPSC Program discounted cash prices to the general public, but not reporting those prices as CVS's U&C prices even though they qualified as such.

19.     Plaintiffs file this Complaint seeking the millions of dollars they were overcharged by CVS through CVS's unlawful scheme to submit fraudulently inflated U&C prices to Plaintiffs for prescription drugs purchased by their members.

## PARTIES

### A. Plaintiffs

20.     Highmark Inc. is as a Pennsylvania nonprofit corporation whose registered business address is 1800 Center Street, Camp Hill, Cumberland County, PA 17011. Its business purpose is to operate a nonprofit hospital plan and nonprofit professional health service plan pursuant 40 PA C.S.A. sections 6101, et seq. and 6301, et seq., respectively.

21.     Highmark BCBSD Inc. is a Delaware not-for-profit membership corporation, whose registered business address is 800 Delaware Avenue, Wilmington, New Castle County, DE 19801. Its business purpose is to operate a health service corporation under Delaware law.

22.     Highmark West Virginia Inc. is a West Virginia nonprofit corporation whose registered business address is 614 Market Square, Parkersburg, Wood County, WV 26101. Its business purpose is to act as a West Virginia health service corporation.

23.     HealthNow New York Inc. ("HealthNow") is a New York corporation and is a wholly-owned subsidiary of HealthNow Systems, Inc. HealthNow has its principal place of business at 257 W. Genesee Street, Buffalo, NY 14202. HealthNow does business as BlueCross BlueShield of Western New York and BlueShield of Northeastern New York.

24.     Plaintiffs are independent licensees of Blue Cross and Blue Shield Association, which is a national association of 36 independent, community-based and locally operated Blue Cross Blue Shield Companies. Blue Cross Blue Shield companies provide health insurance to more than 107 million people in all 50 states, Washington, D.C., and Puerto Rico.

**B.  Defendant**

25.     Defendant CVS Pharmacy, Inc. is a corporation organized under the laws of Rhode Island and headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895.  CVS Pharmacy, Inc. is a wholly-owned subsidiary of CVS Health Corporation.

## JURISDICTION AND VENUE

26.     The Court has jurisdiction over this matter and over Defendant pursuant to 28 U.S.C. § 1332.  Complete diversity exists because (1) Plaintiffs are incorporated in and have their principal places of business in Pennsylvania, Delaware, West Virginia, and New York and (2) Defendant CVS Pharmacy, Inc. is incorporated in Rhode Island and has its principal place of business in Rhode Island.  In addition, the amount in controversy exceeds $75,000.

27.     Alternatively, jurisdiction exists under 28 U.S.C. § 1367.

28.     The Court has general personal jurisdiction over Defendant because its principal place of business is located in Rhode Island.

29.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in, and are subject to personal jurisdiction in, this District at the time Plaintiffs commenced this action and because Defendant's contacts within this District are significant and sufficient to subject Defendant to personal jurisdiction.  Venue is appropriate in this District for the further reason that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**FACTUAL ALLEGATIONS**

**I.   CVS's Business**

30.     CVS describes itself as "the nation's premier health innovation company" with "a bold new approach to total health," including its business strategy of "delivering transformational products and services."  *See* CVS Health Corporation 2019 Annual Report at 2, *available at* https://bit.ly/2VI5uUp (last accessed on November 16, 2020).

31.     CVS's most recognizable business segment is its nationwide chain of retail pharmacy stores.  CVS has approximately 9,900 locations throughout the United States, including numerous locations in this District, where its corporate headquarters is located.  *Id.* at 2.  According to CVS, 70% of the U.S. population lives within three miles of a CVS retail pharmacy, and one-in-three Americans interact with CVS annually.  *Id.* at 2.

32.     CVS's retail pharmacy stores are also CVS's most profitable business segment.  In 2019, CVS reported total revenues of $86.6 billion from those stores, with a reported adjusted operating income of $7.4 billion.  *Id.* at 6, 63-65, 68.

33.     Pharmacy counters provide the vast majority of the retail stores' revenue.  For 2019, CVS reported pharmacy revenues of $66.4 billion, which is approximately 76.7% of all revenue from CVS's retail stores.  *Id.* at 6, 63.  According to CVS's 2019 Annual Report, "retail pharmacy operations will continue to represent a critical part of the Company's business."  *Id.* at 68.

34.     This action concerns the price that CVS charged Plaintiffs for generic drug prescriptions filled by Plaintiffs' members.

35.     A generic drug is a copy of a brand-name drug, which by law must have the same active ingredients, same strength, and same mechanism of action as the brand name drug it copies.

36.     The vast majority of all prescriptions filled in the United States are for generic drugs—approximately 86%, according to the IMS Institute for Healthcare Informatics.

7

37.     Generic drugs are a critical part of CVS's retail pharmacy operations.  In 2019, CVS dispensed approximately 1.417 billion prescriptions—approximately 26.6% of the total retail pharmacy prescriptions dispensed in the entire United States.  *Id.*  The vast majority of these prescriptions—88.3% of them, or approximately 1.25 billion of CVS's dispensed prescriptions— were for generic drugs.  *Id.*

38.     Perhaps counterintuitively, CVS earns a *higher* profit margin on generic drugs than it earns on more expensive brand name drugs.  As CVS's 2019 annual report states, "generic drugs . . . normally yield a higher gross profit rate than equivalent brand name drugs."  *Id.* at 32.  According to CVS, "[t]he increased use of generic drugs has positively impacted the [retail pharmacy] segment's operating income and adjusted operating income …"  *Id.* at 69.

## II.  CVS Is Required To Submit True And Accurate Usual & Customary Prices To Plaintiffs.

### A.  CVS Must Submit The True And Accurate U&C Price During The Adjudication Process.

39.     Consumers who are uninsured, or who pay cash for generic prescription drugs, represent a relatively small portion of the market.  The vast majority of transactions for generic prescription drugs in the United States are paid for by health plans like Plaintiffs.

40.     Each time one of Plaintiffs' members uses his or her insurance to pay for a prescription, CVS submits the member's insurance information electronically to Plaintiffs' PBMs in a process called adjudication.

41.     At all relevant times, CVS used the industry standard established by the National Council for Prescription Drug Programs ("NCPDP") related to the electronic transmission and adjudication of its pharmacy claims.

42.     NCPDP is a non-profit, multi-stakeholder organization that develops industry standards for electronic healthcare transactions used in prescribing, dispensing, monitoring,

managing, and paying for medications and pharmacy services.  Its membership is made up of approximately 1,500 stakeholders from across the pharmaceutical industry, including pharmacies, pharmacists, health plans, and government agencies.  The NCPDP works through a consensus process to develop industry standards, many of which have been adopted into federal legislation, including HIPAA, MMA, HITECH and Meaningful Use (MU).

43.     HIPAA requires uniform methods and codes for exchanging electronic information between health plans.  These standards were developed by the NCPDP and are referred to as the NCPDP Telecommunications Standard.  HIPAA also requires prescribers follow the NCPDP SCRIPT Standards when prescribing drugs under Medicare Part D.  *See* 42 C.F.R. § 423.160.  The NCPDP also adjudicates claims between pharmacies and patients.

44.     As a required component of the adjudication process, CVS reports to third party payors, like Plaintiffs, CVS's U&C price for the drug being dispensed in Field 426-DQ.

45.     The NCPDP's standards define the U&C price as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."  The U&C price, the NCPDP standards explain, "represents the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."  In other words, the U&C price is what a customer who buys a given drug without using any insurance customarily pays.

**B.  Plaintiffs Pay CVS, Through PBMs, The
"Lesser Of" A Negotiated Price Or The U&C Price.**

46.     PBMs play an integral role in adjudication and in this action.  PBMs act as middlemen between CVS and Plaintiffs, providing a variety of services including the negotiation of drug prices and the management of prescription billing.

47.     Plaintiffs had contracts with multiple PBMs during the relevant period.  Each contract contains a list of specific prices for certain drugs covered by each Plaintiff's insurance plans.  These listed prices are the negotiated prices that Plaintiffs pay to the PBM when a given prescription for that drug is dispensed at CVS.

48.     But Plaintiffs are not always required to pay PBMs the specific, negotiated price listed in their respective contracts.  The contracts also provide that Plaintiffs only owe the "lesser of" or "lower of" the negotiated price or the U&C price.  Where the negotiated price listed in the PBM contract is greater than this U&C price, Plaintiffs only owe the U&C price—not the negotiated price.

49.     These contracts generally define the U&C price consistently with the NCPDP definition to mean the "cash" price to the general public, which is the amount charged to customers who are paying out-of-pocket for the prescription.

50.     In this way, "lesser of" pricing ensures that Plaintiffs—and their members—are not charged *more* than customers who simply pay cash.  The "lesser of" provision is intended to ensure that Plaintiffs and their insureds are not charged more than if they had no insurance at all.  But this "lesser of" protection only serves its intended function when CVS accurately reports U&C pricing.

51.     CVS was well aware that its contracts with PBMs and third party payors—and payors contracts' with PBMs—capped CVS's reimbursement at the U&C price if that price was lower than the negotiated price.  Because of this, CVS knew that the price it reported as its U&C price played a critical role in the amount of money it would make on prescription purchases made using insurance—and that CVS could make more money by manipulating its U&C prices.

### C. U&C Is A Critical Pricing Measure That
### CVS Regularly Monitors And Also Manipulates.

52.     U&C prices are almost always higher than the negotiated prices in the PBM contracts.  This makes sense.  A retail price—what a cash customer would pay without insurance—is usually higher than the price an insurer can negotiate for its members.

53.     Once the negotiated prices are set, CVS obviously cannot alter those prices.  But CVS *can* control the U&C price because CVS decides what prices to offer a cash paying customer.  Because CVS gets paid the "lesser of" the negotiated price or the U&C price, CVS has an incentive to ensure that the U&C price is always higher than the negotiated price.

54.     Indeed, CVS carefully monitors the number of transactions paid at its U&C price.  CVS tracked what it called its "U&C Default rate," the percentage of transactions at which health plans have been reimbursed at U&C prices.  CVS runs a weekly report tracking the U&C Default rate and, if that rate becomes too high in CVS's view, CVS raises U&C prices.

### III. CVS Did Not Submit The Cash Discount Program Prices As The U&C Price.

### A. CVS's Competitors Adopted Discount Programs,
### Which Threatened CVS's Margins.

55.     As described above, CVS's pharmacy business is essential to CVS's profitability.  But in 2006, that lucrative business was disrupted.  Large "big-box" retailers with pharmacy departments began offering hundreds of generic prescription drugs at significantly reduced prices.  For example, in September 2006, Walmart began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply.  In November of that same year, Target began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply.  Other "big box" retailers with pharmacy departments followed suit and offered similar, competing discount pricing on generic drugs.

56.     Critically, here:  Walmart reported its $4 price for generic prescription drugs as its U&C price.  Target also reported its discount generic drug prices as its U&C price—until 2015 when CVS acquired Target's pharmacies.  They did so for the straightforward reason that the cash price being offered to the general public was now lower with these discounts than before. Moreover, large retailers, like Walmart and Target, were willing to absorb lower margins on generic drug sales because pharmacy sales represented a relatively low percentage of their total sales.

57.     CVS experienced considerable market pressure as its customers gravitated away from CVS to pharmacies offering significant discounts on certain generic drugs.  For example, in an internal May 2008 presentation, CVS worried that it is "'late to the party' with a competitive $4 offering."

58.     But CVS knew that if it offered similar discounts, CVS risked having to report these discounted prices as the new, lower U&C price—as Walmart and Target did.  CVS's own internal glossary of terms defines U&C to mean "the dollar amount a cash customer usually pays." Moreover, CVS previously offered a senior discount in some of its stores and, when CVS applied that discount, CVS computed a separate U&C price reflecting the senior discount and reported that U&C price to certain PBMs.  CVS was thus concerned that "[m]aking the program 'too attractive' creates higher risk for our 3rd party plan pricing and profitability."  As a result, CVS risked a steep decline in the amount third party payors, like Plaintiffs, would reimburse CVS for those sales if CVS introduced generic drug discounts to compete with retailers like Walmart.

59.     Internal CVS documents show that CVS began monitoring its competitors' generic discount programs and strategizing about whether the competitors were reporting those discount

prices as the U&C prices.[1]  For example, Rite Aid, CVS's competitor, launched its Rx Savings

Card program, which "require[d] no membership fee and [was] free to anyone who enrolls."  About

this program, one CVS employee wrote: "Without any enrollment fee, will this create some of the

3rd party compression we've discussed over the past several months?"  CVS's Tom Morrison,

former Vice President of Managed Care, responded: "I have been puzzled by their offering from

the start.  They expose themselves to other third parties and to Medicaid agencies.  *This is their*

*new U&C.*"[2]

60.     CVS also considered how to avoid what it viewed as a problem of reduced

reimbursements from third party payors like Plaintiffs.  For example, when Kmart introduced its

program in January 2008, one CVS employee wrote:

> I'm wondering if the [sic] Walgreens and KMART are billing usual and
> customary prices to all third party plans and only eating the difference on
> their own generic plan.  Since they identify their plans as third party they
> might not be eroding their global reimbursement like Wal-Mart.  *These are*
> *some interesting points to note if we decide to enter the game.*

**B.  CVS Implemented The HSP Program Not Only To Compete
With Other Discount Programs, But More Importantly,
As A Pretext To Avoid Reporting HSP Prices As U&C Prices.**

61.     CVS worked with a PBM that it owns—Caremark—to develop its own discount

program.  Caremark had valuable knowledge because, at the time, it was administering various

cash discount cards and could provide insight to CVS as CVS developed its own discount program.

As a PBM, Caremark also has information about how CVS's competitors had designed their

programs.

---

[1]     This Complaint quotes CVS internal documents contained in public legal filings.  No documents currently
designated as confidential under any protective order have been included in this Complaint.

[2]     Emphasis added here and throughout unless otherwise noted.

62.     Because of Caremark's experience as a PBM, it knew that CVS would not want to submit any discount price as a U&C price.  Kirby Bessant, Vice President of Consumer Programs at Caremark, wrote to executives at CVS that Caremark would provide CVS advice on "[h]ow to compete on price without exposing 3rd party contracts," *i.e.*, reimbursements under contracts with PBMs.  Caremark knew this would be a concern because, before helping CVS to develop its discount program, Caremark had analyzed whether pharmacies like Walgreens and Rite Aid, which likewise had programs that required patients to "join" a program, were required to report their membership program prices as U&C prices.  Accordingly, CVS and Caremark, including their various legal teams, worked together to design a generic program that—they hoped—would allow CVS to avoid reporting its discount prices as U&C prices.

63.     CVS and Caremark considered the financial impact to CVS of including, in CVS's program, the generics included in Walmart's $4 generic program.  Caremark asked an analyst at CVS to look at those drugs and "determine the impact on the $10.99 price point for these drugs" because "it wouldn't only have impacted the cash paying customers, [i]t would have bled into the third party payors."  In March 2008, eight months before the HSP program launched, the analyst concluded that if CVS included all the drugs on the Walmart list, the "impact to the Third Party business" would be *$866 million per year*.

64.     CVS followed Caremark's advice and concluded that it was unwilling to match the deep discounts on generic drugs provided to customers by big-box retailers like Walmart because "[m]aking the program 'too attractive' creates higher risk for our 3rd party plan pricing and profitability."  In other words, if CVS adopted a discount plan like those other retailers, CVS would be receiving over $1 billion less from health plans like Plaintiffs, who would be making lower payments based on lower reported U&C prices.

65.     So instead, CVS attempted to structure a discount program as a pretext to avoid reporting discount generic prices as U&C.  It decided that consumers would need "to enroll in the program and pay a nominal annual fee" in order to "access" the discounts.  CVS and Caremark then continued to work together to develop a list of drugs for its discount program "to reduce the risk of further erosion of product reimbursement in the commercial marketplace."

66.     In November 2008, CVS launched the Health Savings Pass ("<u>HSP</u>") program, offering 400 generic drugs for $9.99.  The 400 drugs included under the HSP program were among some of the most commonly prescribed generic drugs for cardiovascular, allergy, diabetes, pain, arthritis, cholesterol, skin conditions, mental health, women's health, viruses, thyroid conditions, glaucoma and eye care, gastrointestinal disorders, and other common ailments.

67.     Anyone could join the HSP program.  From November 9, 2008, through 2010, any customer could join the HSP for a $10 fee.  In 2011, CVS raised its enrollment fee to $15 a year and the price of the over 400 HSP generics to $11.99 for a 90-day supply (or a prorated amount of approximately $3.99 for a 30-day supply).

68.     These negligible membership requirements were intended to function as a ruse to avoid submitting lower U&C prices.

69.     CVS designed the HSP to split its cash business, formerly consisting solely of people who pay the cash price (the U&C price), into two segments: customers who pay the retail price and customers who pay the HSP price.

70.     In this way, CVS attempted to claim that when customers paid the HSP price, they were not paying the cash price offered to a member of the general public paying for a prescription drug without insurance—*i.e.*, the U&C price—but were paying a different, discounted price not offered to the cash paying general public.

71.     In reality, however, CVS's HSP price was the most common price charged to cash customers, regardless of whether a cash customer was enrolled in the HSP program.   CVS frequently charged cash customers who were not part of the supposed HSP "membership" program the same prices as those cash customer who were "members."

72.     As previously stated, the NCPDP industry standards provide that the U&C price is the cash price offered to the general public for specific drugs.  CVS offers the HSP price as the cash price to the general public and the HSP price is, in fact, the most common price paid by CVS's cash paying customers.  Internally, CVS even designed HSP sales to "essentially function as a cash script" and part of CVS's "cash" or "retail" business.  Thus, under industry standards—including CVS's own internal definition—the HSP price is CVS's U&C price for each generic prescription drug dispensed in the HSP program.

73.     But from November 2008 to February 2016, CVS did not report HSP prices as the U&C prices.  Nor did CVS report other discount prices offered to the general public, including, but not limited to, discounts offered under CVS's VPSC Program, the successor program to the HSP Program.

74.     CVS concealed this conduct from Plaintiffs.  Plaintiffs did not know or have access to what prices CVS charged its uninsured cash customers, including its HSP customers, nor did Plaintiffs know what percentage of CVS's cash customers paid a retail price versus the HSP price. Plaintiffs therefore had no way of determining on their own whether the price CVS submitted as its U&C price was, in fact, the price offered to cash paying members of the general public. Plaintiffs also did not and could not know that CVS frequently charged non-HSP members the same prices for the same prescriptions as HSP members.

75.     CVS even told their sales personnel who interacted with health plans to refrain from explaining that CVS was not submitting its HSP prices as the U&C price.  In a document distributed to sales and account personnel at CVS, entitled "Talking Points," CVS explained its plan not to submit HSP as its U&C price as follows, but marked the document "Internal Use Only"—not to be discussed with clients:

> Q7:     Why isn't CVS/pharmacy submitting the $9.99 purchases for consideration as 'usual and customary'?

> A7:     CVS/pharmacy chose to create a product to help the uninsured and underinsured access their prescription medications while preserving the U&C. The Health Savings Pass membership program is comparable to other retailers' programs.

76.     This after-the-fact marketing justification is a complete fabrication.  CVS did not choose to create the HSP program to assist the uninsured and underinsured.  It created the HSP program to avoid losing further customers to competitor pharmacies, such as Walmart, Target, Costco, and ShopRite, who offered discounted prices on generic drugs.  Unlike those retail pharmacies, however, CVS was unwilling to report the discounted price as its U&C price and absorb the resulting decline in revenue.

**C.   CVS Continued Its Unlawful Scheme Using ScriptSave.**

77.     In 2010, CVS began to experience pressure from various government agencies performing then-confidential investigations into CVS's failure to report its HSP prices as its U&C prices.  CVS internally feared that the result of these investigations would be that CVS's HSP prices would become its U&C, both for Medicaid reimbursements and for reimbursements by private third party payors, like Plaintiffs.

78.     CVS ultimately decided that it could deflect some of this scrutiny by having a third party administer the HSP program.

79.     In August 2012, John Zevzavadjian, Vice President of Payor Relations at CVS, asked Robert Greenwood, who had contacts within the company, to set up a meeting with Mark Chamness, one of the executives at Medical Security Card Company, LLC, d/b/a "ScriptSave," a company that specializes in the provision of prescription savings cards, and, as Zevzavadjian stated, "had expertise in support of many of our competitors' club programs." Speaking of the meeting to his boss, Tom Gibbons, CVS's Senior Vice President of Payor Relations, Zevzavadjian stated that "[w]e should be moving forward with those compliance issues."

80.     The meeting with ScriptSave was eventually scheduled for November 1, 2012.  An agenda for the meeting states: "[t]he purpose of this meeting is for ScriptSave to present their proposal for the Health Savings pass [sic] Program.  ScriptSave will provide potential solutions to the current HSP legal/compliance issues, make suggestions for how the program can grow going forward, and propose pricing."

81.     CVS had a subsequent meeting with ScriptSave on December 6, 2012, during which ScriptSave pitched why CVS should give ScriptSave the job of administering the HSP program.  Its pitch explained that "ScriptSave's Pharmacy Savings Program minimizes the risk of third party U&C 'discussions' with our administration, contract content, and footprint in the pharmacy savings program space."  Under "Program Features" the first item listed was "Risk of third party U&C."  In this regard, ScriptSave touted that "[a] ScriptSave program can allow CVS to protect its third party reimbursement level as ScriptSave would be the third party administrator of the program."  It explained that claims would pass through the ScriptSave adjudication system, that HSP materials would contain the ScriptSave logo and clearly state ScriptSave is the administrator of the program, and that ScriptSave would be responsible for filing all program materials with the states.

82.     In essence, ScriptSave offered to save CVS from its HSP "problem" by concealing that CVS's prices were, in fact, CVS's prices.  This arrangement was desirable to CVS both because it would (CVS hoped) allow CVS to offer discounted prices on generic drugs without affecting its U&C, and because the arrangement minimized the discussions CVS might have to have with health plans who would want similar pricing.

83.     Around the same time, CVS prepared a presentation for Emdeon, a claim switching company that was in certain aspects ScriptSave's competitor.  That presentation identified as a "Top Priority" to "Resolve Current Issues," including "Best Pricing Issue."

84.     One month later, ScriptSave and Emdeon wrote to executives at CVS, including John Zevzavadjian and Tom Gibbons, pitching a partnership between the companies.  Again, the email touted ScriptSave's expertise, including its "Usual and Customary strategies to 'protect' loyalty member price from third parties."

85.     Based at least in part on ScriptSave's representations of its abilities to "protect [CVS's HSP prices] from third parties," (like Plaintiffs) and with input from "a number of stakeholders within CVS," ScriptSave was selected to administer the HSP program beginning in July 2013.

86.     In July 2013, MedImpact acquired ScriptSave.  MedImpact proclaimed that it could "now provide[] ScriptSave clients the opportunity to capture all transaction data for better utilization management and improved outcomes."

87.     Approximately one year later, Gibbons considered the idea of "'selling' HSP to ScriptSave," and the companies began discussing winding down the HSP program.  CVS decided that "[c]ontinued regulatory and compliance pressure require[d] CVS Health to reevaluate the Health Savings Pass program."  ScriptSave was excited about the opportunity, and told CVS it

was "very happy to be joining your team!"  Both Paige Berger, ScriptSave's Executive Vice President, and Tom Gibbons at CVS acknowledged the valued "partnership" between the two companies.

**D.  CVS Replaced The HSP Program With The VPSC Program.**

88.     In the wake of ongoing and increasing regulatory scrutiny, CVS terminated the HSP program effective February 1, 2016.  But the HSP program's termination did not mean that CVS's misconduct came to an end.  Instead, CVS effectively converted the HSP Program into another Cash Discount Program—the VPSC Program created by ScriptSave, the same entity that had managed the HSP Program for CVS's competitors.

89.     CVS automatically enrolled existing HSP members into ScriptSave's VPSC Program unless members affirmatively opted out.  VPSC provides discounts on both brand name and generic drugs.  In most other respects, the VPSC Program functioned similarly to the HSP Program, and served the same purpose: allowing CVS to compete for cash customers by offering discounted prices, while at the same time providing CVS a pretext for not reporting those prices as its U&C prices.

90.     CVS has continued with these unlawful practices through the VPSC Program to this day, even though the VPSC Program prices plainly qualify as U&C prices and therefore should have been submitted as such.

**E.  CVS Unlawfully Reported False U&C Charges,
     Thereby Overcharging Plaintiffs By Massive Amounts.**

91.     Instead of submitting its Cash Discount Program prices as its U&C prices, CVS inflated the U&C prices that it reported to Plaintiffs and their PBMs by pegging CVS's reported U&C prices to higher prices that did not reflect the true cash prices CVS offered.  CVS has admitted that it never reported the Cash Discount Program prices as its U&C prices.

92.     CVS profited enormously from its overpricing scheme.  In June 2010, CVS analyzed how much it would cost the company to report its HSP prices as the U&C price.  CVS concluded that, for one year alone, "over 67 million private third party scripts would meet this criteria" and that doing so would result in a loss of *over $547 million per year*.  CVS performed similar internal analyses in later years.

93.     In other words, by not reporting these Cash Discount Program prices as its U&C prices, and instead reporting falsely inflated U&C prices, CVS was earning hundreds of millions of dollars more each year.

94.     For many millions of transactions, CVS caused Plaintiffs to pay CVS the negotiated price because the negotiated price was lower than the inflated U&C price that CVS reported.  For those many millions of transactions, CVS should have reported the true U&C price (*e.g.*, the HSP Program price for a given drug).  Had it done so, the adjudicated price—ultimately the price paid by Plaintiffs for the claim—would have, in many cases, been lower than what Plaintiffs paid based on CVS reporting a false and inflated U&C price.

95.     Despite Plaintiffs being unable to discern CVS's true U&C prices on millions of claims, how CVS overcharged Plaintiffs is illustrated by the examples of forty apparent overcharges detailed in **Exhibit 1** attached hereto.

96.     Since 2008, when CVS first implemented the HSP Program, CVS's false and misleading U&C reporting caused Plaintiffs to significantly overpay CVS on millions of those CVS prescription claims, by many millions of dollars.

**IV.  CVS's Fraudulent Concealment Tolled The Statute of Limitations.**

97.     The applicable statute (or statutes) of limitation have been tolled owing to CVS's fraudulent concealment.

98.     CVS did not proactively advertise the HSP program.  As Tom Morrison, former CVS Vice President of Managed Care, put it, CVS "would not be hanging signs all over the store and advertising it constantly."

99.     While part of the reason CVS did not want to proactively advertise the program was because doing so would "cannibalize" its cash business, CVS also recognized that one risk of the program was "[i]mplementation of Retail program will evoke inquiries from PBM clients for access to comparable pricing."

100.    CVS did not disclose to Plaintiffs that the U&C prices reported to health plans for the generic drugs in the HSP program did not include HSP prices or other discounts offered to the general public.

101.    CVS has not disclosed its cash drug pricing information and data to third party payors, including Plaintiffs, that would have revealed CVS's true U&C prices.

102.    CVS also did not post drug prices in a clear manner or in a way that would have alerted Plaintiffs to the artificially inflated prices charged by CVS.  Nor did CVS maintain drug price lists, according to CVS.  In short, CVS misled Plaintiffs into paying inflated prices for certain drugs.

103.    If CVS had been open and public about its fraudulent pricing scheme, it would never have succeeded.  Plaintiffs would have required that CVS report HSP prices as its U&C prices.

104.    CVS instead designed a self-concealing scheme that did not reveal facts that would have put Plaintiffs on inquiry notice that CVS was charging inflated prices for generic prescription drugs.

105.    Because CVS's scheme was kept secret, Plaintiffs were unaware of CVS's unlawful conduct and did not know that they were paying artificially inflated prices for generic prescription drugs sold through CVS's HSP program.

106.    Caremark likewise sought to keep the scheme secret from its health plan clients, and instructed its employees working with those clients that "[t]his is not a strategy to proactively promote to our PBM clients . . . . [T]hese should not be offered without first working with your leadership team and requesting the appropriate analysis to determine if this is an optimal solution for your client."

107.    Accordingly, Plaintiffs had neither actual nor constructive knowledge of the relevant facts underlying their claims for relief.

108.    As a result of CVS's fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the unlawful conduct alleged in this Complaint.

## COUNT I
### (Fraud)

109.    Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through 108 above.

110.    On over a million of claims of payment, CVS deliberately submitted to Plaintiffs, through Plaintiffs' PBMs, inflated U&C prices that were significantly higher than the prices available to individuals who paid for prescription drugs without insurance.  CVS made misrepresentations to Plaintiffs each time CVS reported prices higher than the prices available to individuals who paid without insurance.

111.    CVS's misrepresentations to Plaintiffs began in 2008 and are ongoing.

112.    CVS made its misrepresentations to Plaintiffs via Plaintiffs' PBMs, knowing that the fraudulently inflated U&C charges it submitted would have a material impact on the adjudication process and be communicated to Plaintiffs as the ultimate payor.

113.    Because the U&C price was a payment term necessary for determining Plaintiffs' payment price, the U&C prices CVS reported to Plaintiffs (and Plaintiffs' PBMs) were material.

114.    CVS knew that the cash prices it charged the Cash Discount Program customers were lower than the inflated U&C charges that CVS reported electronically to Plaintiffs (and their PBMs) for the same drugs.  CVS thus knew that the U&C charges it submitted were false and misleading.

115.    CVS submitted inflated U&C prices on claims for payment by Plaintiffs with the knowledge and intent that those false U&C prices would be relied upon to adjudicate Plaintiffs' payments, to the benefit of CVS.  Specifically, through this fraudulent scheme, CVS intended to gain reimbursement payments in amounts far greater than it was entitled.

116.    Plaintiffs lacked the ability to discover CVS's fraud.  CVS withheld and did not disclose the fact that, internally, CVS deemed the Cash Discount Programs to involve cash pricing, be part of CVS's cash business, and otherwise qualify as U&C prices—even though in public-facing communications CVS insisted that these programs were membership programs that were not meant for customers with insurance and were not meant to be U&C prices.  Furthermore, Plaintiffs had no means to identify how many CVS customers were actually paying the Cash Discount Program prices; or to identify the precise list of drugs discounted by those programs; or to identify the prices at which all of those discounted drugs were offered to CVS's cash customers.  CVS also concealed that it frequently offered the same cash prices to customers who were not enrolled in the Cash Discount Programs as it did to those who had enrolled in those programs.

117.     Plaintiffs justifiably relied on the accuracy of the pricing information that CVS reported during adjudication of each and every transaction.

118.     As a result of CVS's fraudulent conduct and Plaintiffs' justifiable reliance, Plaintiffs have sustained immense damage—millions of dollars in overpayments to CVS.

119.     In addition, CVS's fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for their members.

120.     CVS's false and misleading conduct is ongoing.  CVS continues to report inflated U&C prices for claims submitted for payment by Plaintiffs.

## COUNT II
### (Fraudulent Concealment)

121.     Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through 108 above.

122.     CVS had special knowledge of material facts, *i.e.*, the accurate, non-inflated U&C prices, which the Plaintiffs did not have.

123.     CVS knew what the accurate, non-inflated U&C prices were for the prescription drugs for which it submitted claims for reimbursement from Plaintiffs' PBMs and Plaintiffs.  These prices were the same prices CVS was charging customers under its Cash Discount Programs.

124.     CVS knew or should have known that Plaintiffs' PBMs and Plaintiffs would rely upon CVS not to conceal the accurate, non-inflated U&C prices to adjudicate CVS's claims for reimbursement, and that CVS's stated prices would induce Plaintiffs to act, *i.e.*, paying the inaccurate and inflated U&C prices.

125.     CVS had a duty to disclose the accurate, non-inflated U&C prices.  CVS had special knowledge of the accurate, non-inflated U&C prices, which Plaintiffs could not have known.

126. CVS withheld and did not disclose the fact that, internally, CVS deemed the Cash Discount Programs to involve cash pricing, to be part of CVS's cash business, and to otherwise qualify as U&C prices—even though in public-facing communications CVS insisted that these programs were membership programs that were not meant for customers with insurance and were not meant to be U&C prices.

127. Furthermore, Plaintiffs had no means to identify how many CVS customers were actually paying the Cash Discount Program prices; or to identify the precise list of drugs discounted by those programs; or to identify the prices at which all of those discounted drugs were offered to CVS's cash customers.

128. CVS also concealed that it frequently offered the same cash prices to customers who were not enrolled in the Cash Discount Programs as it did to those who had enrolled in those programs.

129. Disclosure of these facts were necessary to correct the misleading information that CVS reported for claims for payment submitted to Plaintiffs—namely, the inflated U&C prices CVS was reporting.

130. As a result of CVS's fraudulent concealment, Plaintiffs have sustained immense damage in the form of overpayments to CVS totaling many millions of dollars.

131. In addition, CVS's fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for its members.

132. CVS's fraudulent conduct is ongoing: CVS continues to report inflated U&C prices for claims submitted for payment by Plaintiffs.

133. Plaintiffs are entitled to recover damages against CVS based on CVS's fraudulent concealment in an amount to be determined at trial.

## COUNT III
### (Negligent Misrepresentation)

134.     Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through 108 above.

135.     CVS made false statements of material fact each time it submitted a claim for payment, failing to report the Cash Discount Program pricing as its U&C price.

136.     CVS knew or should have known that the prices it submitted to Plaintiffs for reimbursement on Cash Discount Program transactions were false.

137.     At the very least, CVS exercised both carelessness and negligence in ascertaining the truth of the U&C prices it reported on claims submitted for reimbursement by Plaintiffs.

138.     CVS controls the mechanism by which it calculates and reports its U&C prices.  At all relevant times, CVS knew that Plaintiffs and their PBMs would rely upon the information that CVS calculated and supplied as its U&C price to calculate payment amounts in millions of reimbursement transactions.   Because CVS calculates and reports the U&C prices that its pharmacies report on claims for reimbursement by Plaintiffs and their PBMs, CVS is in the business of supplying information for the guidance of others in their business transactions.  CVS consequently owed Plaintiffs a duty to communicate accurate information to Plaintiffs.

139.     CVS intended for Plaintiffs' PBMs and Plaintiffs to use the U&C prices it reported on claims submitted for Plaintiffs' reimbursement to reimburse claims in accordance with the "lesser of" calculation contained in CVS's agreements with their respective PBMs (and similar agreements between CVS and Plaintiffs' PBMs) and the contracts between Plaintiffs and Plaintiffs' PBMs.

140.     Plaintiffs acted in reliance on CVS's false statements of fact by reimbursing millions of claims according to the prices submitted by CVS.

141.    As a result of CVS's misrepresentations, Plaintiffs have sustained immense damage in the form of millions of dollars of overpayments to CVS.

142.    In addition, CVS's negligent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for its members.

143.    CVS's negligent conduct is ongoing: CVS continues to report inflated U&C prices for claims submitted for payment by Plaintiffs.

144.    Plaintiffs are entitled to recover damages against CVS based on CVS's negligent misrepresentations in an amount to be determined at trial.

## COUNT IV
### (Unjust Enrichment)

145.    Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through 108 above.

146.    CVS owed, and continues to owe, a duty to Plaintiffs to provide Plaintiffs with accurate U&C prices on reimbursement claims.

147.    Because CVS fraudulently inflated the U&C prices it reported on millions of claims submitted for Plaintiffs' reimbursement, Plaintiffs overpaid millions of dollars to CVS.

148.    CVS knowingly and voluntarily accepted these millions of dollars in overcharges to Plaintiffs.

149.    Plaintiffs' overpayments should not have been paid to CVS.  Those millions of dollars in overpayments should have been retained by Plaintiffs.

150.    CVS's retention of these overpayment amounts violates fundamental principles of justice, equity, and good conscience.

151.    Under the circumstances described above, it would be inequitable for CVS to retain these overpayments.

152.    In addition, CVS's wrongful conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for Plaintiffs' members.

153.    CVS's wrongful conduct is ongoing: CVS continues to report inflated U&C prices for claims submitted for payment by Plaintiffs.

154.    As a result of CVS's wrongful conduct, CVS has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs.

155.    CVS is therefore liable to Plaintiffs for restitution in the amount of CVS's wrongfully obtained monies.

**COUNT V**
**(Civil Liability For Larceny By False Pretenses**
***pursuant to* R.I. Gen. Laws § 9-1-2; § 11-41-4)**

156.    Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through 108 above.

157.    On millions of claims of payment, CVS deliberately submitted to Plaintiffs, through Plaintiffs' PBMs, inflated U&C prices that were significantly higher than the prices available to individuals who paid for prescription drugs without insurance.

158.    CVS made these claims to Plaintiffs with the intent to defraud Plaintiffs by causing them to overpay for these claims.  Plaintiffs did, in fact, pay the submitted claims, and as a result, CVS obtained millions of dollars through its fraud.

159.    CVS's conduct as alleged herein constitutes larceny under R.I. Gen. Laws § 11-41-4, because it obtained substantial sums of money from the Plaintiffs designedly, by false pretenses, with the intent to cheat or defraud.

160.    Because CVS's conduct constitutes larceny, CVS is civilly liable to Plaintiffs for twice the amount Plaintiffs were overcharged under R.I. Gen. Laws  § 9-1-2.

**ALTERNATIVE CLAIMS**

161.    Plaintiffs assert that Rhode Island law applies to Counts I through V, and Plaintiffs'

Prayer for Relief.  Should CVS assert and the Court determine that a different state's law should

apply, and/or to the extent that the following causes of action can be asserted consistent with

application of Rhode Island law, Plaintiffs assert the following additional claims, Counts VI and

Count IX, in the alternative.

**COUNT VI**
**(Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the**
**"UTPCPL") 73 P.S. §§ 201-1 – 201-9.3)**
**(Brought by Highmark Inc.)**

162.    Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through

108 above.

163.    The UTPCPL prohibits persons from  employing "[u]nfair methods of competition"

and "unfair or deceptive acts or practices," which includes "[e]ngaging in any other fraudulent or

deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-

2(4)(xxi).

164.    Highmark Inc. and CVS are, and at all relevant and material times, were, a person

under the UTPCPL.

165.    CVS's business acts and practices, as alleged herein, violated the UTPCPL by

engaging fraudulent and deceptive conduct which created a likelihood of confusion or of

misunderstanding.

166.    CVS's conduct as alleged herein constitutes unfair or deceptive acts or practices

likely to create confusion or misunderstanding by:

a.    Submitted inflated U&C prices as the true U&C prices of generic drugs;

b.    Misrepresented its inflated U&C prices as the true U&C prices;

      c.   Failed to disclose the true U&C prices of generic drugs.

167.    As a direct result of their foregoing acts and practices in violation of the UTPCPL, CVS caused Highmark Inc. to pay the inflated U&C prices submitted by CVS for reimbursement, which caused Highmark Inc. to overpay for generic prescription drugs.

168.    At all relevant times, CVS made misleading and deceptive statements and omissions through its submission of inflated U&C prices for its generic prescription drugs.

169.    CVS knew or should have known that its representation that its inflated U&C price was the true U&C price would create the confusing and misleading impression that the inflated price CVS submitted at U&C was the true U&C price.

170.    CVS's actions are ongoing: CVS continues to report inflated U&C prices for claims submitted for payment by Highmark Inc.

171.    As a direct result of CVS's foregoing acts and practices in violation of the UTPCPL, CVS caused Highmark Inc. to overpay for prescription drugs by many millions of dollars.

172.    CVS is therefore liable to Highmark Inc. for the damages it sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

**<u>COUNT VII</u>**
**(Violation of the Pennsylvania Insurance Fraud Act**
**73 Pa.C.S.A. § 4117, et seq.)**
**(Brought by Highmark Inc.)**

173.    Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through 108 above.

174.    The Pennsylvania Insurance Fraud Act (the "PIFA") provides that "[a] person may not knowingly and with intent to defraud any insurance company… file an application for insurance containing any false information or conceal for the purpose of misleading information concerning any fact material thereto." 18 Pa.C.S.A. § 4117(b)(4).

175.     The PIFA further provides that "[a]n insurer damaged as a result of a violation of this section may sue therefor in any court in any court of competent jurisdiction to recover compensatory damages, which may include reasonable investigation expenses, costs of suit and attorney fees. An insurer may recover treble damages if the court determines that the defendant has engaged in a pattern of violating this section." 18 Pa.C.S.A. § 4117(g).

176.     Highmark Inc. is an insurer as defined under 18 Pa.C.S.A. §4117(1).

177.     CVS knowingly and with intent to defraud submitted claims for reimbursement to Highmark Inc. CVS knowingly failed to disclose the true U&C price, instead submitting falsely inflated U&C prices that were significantly higher than the prices available to individuals who paid for prescription drugs without insurance.

178.     CVS engaged in a pattern of violating PIFA.

179.     As a direct result of CVS's conduct, Highmark Inc. suffered damages, as well as investigation expenses, costs of suit, and attorneys' fees.

180.     Pursuant to PIFA, 18 Pa.C.S.A. § 4117, Highmark Inc. is entitled to recover treble damages, as well as investigation expenses, costs of suit, and attorneys' fees, plus interest.

### COUNT VIII
**(Violation of the Delaware Consumer Fraud Act (the "DCFA") 6 Del. C. § 2511 et seq.)**
**(Brought by Highmark BCBSD Inc.)**

181.     Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through 108 above.

182.     The DCFA was enacted to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices." 6 Del. C. § 2512. It is intended to remedy "[t]he act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission, in connection with the sale or

advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby… ." 6 Del. C. § 2511(2).

183.    In carrying out the scheme as described herein, CVS engaged in unfair, deceptive, and fraudulent conduct in violation of the DCFA by using or employing deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of the true U&C prices, with the intent that Highmark BCBSD Inc. would rely upon such concealment, suppression or omission in connection with the purchase of generic pharmaceutical drugs.

184.    Highmark BCBSD Inc. was the victim of CVS's unlawful conduct because Highmark BCBSD Inc. paid for these generic pharmaceutical drugs on behalf of its members.

185.    Highmark BCBSD Inc. suffered damages as a direct result of CVS's unlawful conduct.

186.    The actions of CVS were fraudulent, malicious, reckless and/or oppressive and undertaken to injure Highmark BCBSD Inc.  Accordingly, CVS is liable to Highmark BCBSD Inc. for punitive and exemplary damages in an amount to be proven at trial.

187.    Highmark BCBSD Inc. is entitled to an award of costs incurred herein.

188.    Highmark BCBSD Inc. is further entitled to declaratory and injunctive relief to prevent CVS from continuing its unlawful conduct.

**COUNT IX**
**(Violation of N.Y. Gen. Bus. Law § 349, et seq.)**
**(Brought by HealthNow)**

189.    Plaintiffs incorporate and reallege the allegations set forth in Paragraphs 1 through 108 above.

190.    CVS's business acts and practices alleged herein constitute deceptive, fraudulent, and materially misleading acts, practices, and statements under N.Y. Gen. Bus. Law § 349.

191.    HealthNow is, and at all relevant and material times was, a "person" for purposes of N.Y. Gen. Bus. Law § 349.

192.    CVS's business acts and practices, as alleged herein, violate N.Y. Gen. Bus. Law § 349 for the following reasons:

    a.  CVS's conduct, as described herein, was consumer-oriented, for purposes of N.Y. Gen. Bus. Law § 349.

    b.  CVS knowingly engaged in deceptive, fraudulent, and misleading commercial practices in failing to reveal material facts and information about CVS's true U&C prices, which misled HealthNow about facts that could not reasonably be known by HealthNow;

    c.  CVS failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

    d.  CVS failed to reveal material facts about CVS's true U&C prices to HealthNow with the intent that HealthNow would rely upon those omissions; and

    e.  CVS made material representations and statements of fact to HealthNow that resulted in HealthNow reasonably believing the represented or suggested state of affairs to be other than what they actually were.

193.    CVS performed deceptive acts and practices, as described herein, within the State of New York.

194.    CVS intended that HealthNow rely on CVS's misrepresentations and omissions, so that HealthNow would reimburse millions of claims at inflated rates.

195.   Had HealthNow known CVS's true U&C prices, HealthNow would have paid millions of dollars less for the reimbursement of claims submitted by CVS.

196.   HealthNow has been adversely affected by CVS's acts, omissions, and practices, as described herein.

197.   CVS's actions caused a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to HealthNow's members.

198.   CVS's actions are ongoing: CVS continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by HealthNow.

199.   CVS's acts, omissions, and practices, as described herein, proximately caused HealthNow to suffer actual damages in the form of, *inter alia*, overpaying reimbursements on millions of prescription claims. Consequently, HealthNow is entitled to actual and treble damages pursuant to N.Y. Gen. Bus. Law § 349(h), as well as reasonable attorney's fees.

200.   Additionally, pursuant to N.Y. Gen. Bus. Law § 349(h), HealthNow seeks injunctive relief ordering CVS to cease reporting inflated U&C prices in its NCPDP field 426-DQ for claims submitted for payment by HealthNow.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against CVS as follows:

a.   For compensatory, consequential, and/or general damages in an amount to be determined at trial;

b.   For exemplary or punitive damages as permitted by law;

c.   For a complete accounting of all monies, earnings, profits, compensation, and benefits received by CVS from Plaintiffs, and for disgorgement and restitution of all monies obtained as a result of its unlawful practices, acts, and omissions described in this Complaint;

d.   For an award of twice the amount that Plaintiffs were overcharged, pursuant to R.I. Gen. Laws § 9-1-2;

e.    In the alternative, for all remedies available under the statutes invoked in the Alternative Claims, Counts VI-IX;

f.    For injunctive relief prohibiting CVS from continuing to engage in the unlawful practices, acts, and omissions described in the Complaint;

g.    For costs and disbursements of the action, together with reasonable attorneys' fees;

h.    For pre-judgment interest at the Rhode Island statutory rate of 12%; and

i.    For such other further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a jury trial on all claims so triable.

Dated:  December 3, 2020                    Respectfully submitted,

/s/ Christian R. Jenner
Christian R. Jenner (#7731)
Paul M. Kessimian (#7127)
Phoebe A. Roth (#10078)
PARTRIDGE SNOW & HAHN LLP
40 Westminster Street, Suite 1100
Providence, RI  02903
Tel:  (401) 861-8200
Fax: (401) 861-8210
cjenner@psh.com
pkessimian@psh.com
proth@psh.com

- *and* -

Robert B. Gilmore (*pro hac vice* forthcoming)
Jed Wulfekotte (*pro hac vice* forthcoming)
Michael A. Petrino (*pro hac vice* forthcoming)
Shawna Bray (*pro hac vice* forthcoming)
STEIN MITCHELL BEATO & MISSNER LLP
901 15th Street, N.W., Suite 700
Washington, D.C.  20005
Tel:  (202) 737-7777
Fax: (202) 296-8312
rgilmore@steinmitchell.com
jwulfekotte@steinmitchell.com
mpetrino@steinmitchell.com
sbray@steinmitchell.com

*Counsel for Plaintiffs*

3949554.2/30626-2